1                    UNITED STATES BANKRUPTCY COURT
                      CENTRAL DISTRICT OF ILLINOIS
2

3    IN RE:                      :   Case No. 09-80727

4    T. A. BRINKOETTER & SONS,   :   Chapter 11
     INC.,
5                                :   Peoria, Illinois
         Debtor.                     Tuesday, September 29, 2009
6                                :   10:05 a.m.

7    : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8
                         TRANSCRIPT OF HEARING ON DEBTOR'S
9              MOTION TO SELL AND OBJECTIONS THERETO
               BEFORE THE HONORABLE THOMAS L. PERKINS,
10                 UNITED STATES CHIEF BANKRUPTCY JUDGE

11
     APPEARANCES:
12
     For the Debtor:             Rafool & Bourne, PC
13                               BY:  SUMNER A. BOURNE, ESQ.
                                 411 Hamilton Blvd., Ste. 1600
14                               Peoria, Illinois  61602

15   For the United States       United States Trustee's Office
     Trustee:                    BY:  TIMOTHY RUPPEL, AUST
16                               401 North Main Street, #1100
                                 Peoria, Illinois  61602
17

18
     Audio Operator:             MICHELLE HEITZMAN, ECRO
19                               (309) 671-7035

20

21   Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                                 1133 Tanager Trail
22                               Virginia Beach, Virginia  23451
                                 (757) 422-9089
23

24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.

1 | APPEARANCES (via telephone):

2 | For East Central Illinois      Cavanagh & O'Hara
Pipe Trades Health &       BY:  JOHN A. WOLTERS, ESQ.
3 | Welfare Fund, et al.:      407 E. Adams Street
Post Office Box 5043
4 |                     Springfield, Illinois  62705

5 | For Sheet Metal Workers      Cavanagh & O'Hara
Local 218, et al.:       BY:  JAMES P. MOODY, ESQ.
6 |                     407 E. Adams Street
Post Office Box 5043
7 |                     Springfield, Illinois  62705

8 | For Soy Capital Bank and      THOMAS M. SHADE, ESQ.
Trust Company:       132 S. Water Street, #515
9 |                     Decatur, Illinois  62523

10 | For the Internal Revenue      United States Attorney's Office
Service:       BY:  GERARD A. BROST, AUSA
11 |                     211 Fulton Street, #400
Peoria, Illinois  61602
12 |

13 | For Busey Bank:      THOM MOSS, ESQ.
Post Office Box 1700
Decatur, Illinois  62523
14 |

15 | For Durbin Enterprises:      Meyer Capel, P.C.
BY:  ROCHELLE A. FUNDERBURG
306 W. Church Street
16 |                     Champaign, Illinois  61826

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                    P R O C E E D I N G S

2           THE COURT:  Okay.  Good morning, everyone.

3           This is a hearing that's being held in the case filed

4    by T. A. Brinkoetter & Sons, Inc.  We've got several parties on

5    the telephone and then some in the courtroom.

6           So I'll take appearances from those in the courtroom

7    first, beginning with Mr. Bourne.

8           MR. BOURNE:  Sumner Bourne for debtor in possession.

9           MR. RUPPEL:  Tim Ruppel on behalf of the United States

10   Trustee.

11          THE COURT:  Okay.  And then for purposes of

12   identifying those -- for purposes of identifying those on the

13   telephone, I'll go through my list of expected participants.

14          Is Mr. Leo on the line?

15      (No response)

16          THE COURT:  How about Ms. Funderburg?

17          MS. FUNDERBURG:  Yes.

18          THE COURT:  Okay.  And you represent Durbin

19   Enterprises, is that right?

20          MS. FUNDERBURG:  Correct.

21          THE COURT:  How about Mr. Wolters?

22          MR. WOLTERS:  Yes, Your Honor.

23          THE COURT:  All right.  And you represent East Central

24   Illinois Pipe Trades Health & Welfare Fund and maybe others?

25          MR. WOLTERS:  Yes, Your Honor.  Plumbers &

1  Steamfitters Local 65 Pension Fund, as well as the Plumbers &

2  Steamfitters National Pension Plan.

3          THE COURT:  Okay.

4          Is Mr. Shade on the line?

5          MR. SHADE:  I am, Your Honor, for Soy Capital Bank.

6          THE COURT:  Okay.

7          How about Mr. Brost?

8          MR. BROST:  Yes, Your Honor.  I'm, I'm in Chicago

9  today and I'm here representing the Internal Revenue Service.

10          THE COURT:  Okay.

11          Is anyone else on the line that I haven't mentioned?

12          MR. MOSS:  Judge, Thom Moss, M-O-S-S.  I'm here for

13  Busey Bank, and we just have a secured vehicle.

14          THE COURT:  Okay.

15          MR. MOODY:  Jim Moody with, representing the Sheet

16  Metal Workers Local 218 Fringe Fund and the NECA-IBEW Pension

17  Welfare Fund.

18          THE COURT:  Okay.

19          Anybody else?

20      (No response)

21          THE COURT:  All right.

22          This is a preliminary hearing on the debtor's motion

23  for authorization to conduct a sale of substantially all of its

24  assets pursuant to Section 363 of the Bankruptcy Code and

25  there's been a number of objections filed.

1       And before we get to those objections specifically, I

2  think it's appropriate to start with the debtor's counsel and

3  let him identify where the debtor is at, particularly in light

4  of a, of the representation that there would be a, a more

5  detailed sale procedures motion to be filed, which hasn't been

6  filed yet.

7       So can you give us a status update, Mr. Bourne?

8       MR. BOURNE:  Yes, Your Honor.

9       The, the purpose of this motion was really just to

10  clarify and, and to detail what assets were in, the debtor

11  intends to include in the, in the sale and what assets were

12  contemplated to be excluded.

13       It's still very early on in the sale process, probably

14  because there is -- Soy Capital holds a substantial lien,

15  blanket lien against debtor's personal property, as well as a

16  mortgage on real estate.  There are ongoing negotiations with

17  Swank Enterprises/SARS, which is a, a corporation that's merged

18  with the former shareholders of the debtor and still has, Soy

19  still has some of those other entities on for liability.

20       There are ongoing negotiations to have the, Soy paid

21  off in full, removed from the case, essentially, for full

22  payment not from debtor assets, but from SARS/Swank

23  Enterprises' assets and release its lien and that, really, is a

24  preliminary thing that has to be done first.

25       The -- the -- there is a, was a written settlement

1   agreement in place between Soy and SARS with a funding date of

2   tomorrow, September 30th, and we had hoped that that settlement

3   would be completed by now and that Soy would be out of the

4   picture as a lien holder.  Unfortunately, due to funding

5   problems, that's not happened.  There -- I believe there's a

6   meeting between SARS, its counsel, and Mr. Shade scheduled

7   either, either today or yesterday.

8          But that, that is really the first preliminary step

9   that has to be resolved first and that, that has not happened

10  yet.

11         Once that Soy issue is taken care of, as well as the

12  other issues, there is a, a very important lease with Citizens

13  Bank of Cropsey that really has to be cured and assumed.  The

14  equipment is really integral to any operation as a going

15  concern of the debtor and the -- there are also ongoing

16  negotiations for an extension of time for a cure to be made

17  with Cropsey.  And I think that has to happen first, also, as

18  well.

19         Again, we had hoped that, that those issues --

20  those -- both those issues would be resolved by tomorrow, but

21  it appears that's not going to happen.

22         Once those issues are resolved, the, the intention of

23  the debtor is to, is to file a motion to establish bidding

24  procedures, also to follow the procedural requirements of

25  363(f) to identify specifically the lien holders that are

1   remaining, significantly with Soy, ideally, being removed from

2   the, from the, from the picture, which will actually make

3   things go much, much smoother, and also file a motion for

4   authorization for a stalking horse to appear.

5        The, the anticipated bidder for the assets is, is the

6   SARS Company, which is a company out of Seattle, Washington

7   that has merged with the former shareholder of, of the, the

8   debtor.  It's our intention, the debtor's intention to fully

9   disclose any relationship between SARS' current management and

10  the debtor's management or any party wants to raise an

11  objection to the motion for SARS to be a stalking horse, they

12  will be given full disclosure of the relationship and

13  opportunity to do so.

14       SARS has made an offer of $2 million for the assets,

15  but again, a lot of that is still contingent on the settlement,

16  being released with Soy and Cropsey, as well as financing being

17  accomplished.

18       But -- so that's -- my intention today would be a

19  preliminary motion that's, that's before the Court is to

20  request a 30-day continuance with the hopes that within 30 days

21  the Soy and Cropsey issues will be fully resolved and the

22  debtor will be in a position to make a full, detailed motion

23  for auction procedures, establishing bidding procedures,

24  overbid protections, and, and other stalking horse protections

25  for, for SARS.

1          THE COURT:  Okay.  And there's been several objections

2   raised by, it looks like either subcontractors or labor or

3   material suppliers with regard to some of the projects

4   questioning whether or not the debtor's intent is to eliminate

5   lien rights.  I didn't think it was, but I'll ask you to

6   respond to that.

7          MR. BOURNE:  It's not, Your Honor.  The -- I think

8   there were a total of six objections filed.  Again, the, most

9   of the objections, I think, raised will be dealt with in the

10  second motion, the motion to establish bidding procedures.

11  I'll kind of go through briefly what the debtor's intentions

12  are at each, with each objection.

13         As for the Unions, which I think are three of the six

14  objections, any postpetition benefits that have not been paid,

15  the, the Court's very aware of the debtor's efforts and, and

16  struggles to keep current with the postpetition union benefits.

17  It's not the debtor's intention to, to shortchange the union

18  benefit funds at all or in any way reject the collective

19  bargaining agreement.  I'm contemplating putting a carve-out

20  provision in the sale for any unpaid union benefits to be paid

21  in full at the closing of the, of the sale.

22         The other objection is by Soy, which, essentially, is

23  asking for a continuance of today's hearing, which, again, Soy,

24  ideally, would be taken care of in the next 30 days.

25         The -- I think Durbin Enterprises has filed an

1    objection, which, again, we -- the debtor's -- it's not the

2    debtor's intention in any way to cut off lien rights,

3    mechanic's liens rights, or otherwise, of any, any suppliers

4    and any, any of the contracts.  I, I certainly would be glad to

5    work with counsel on, on agreed language in any order, sale

6    order that would, would cure that problem.

7         And the final objection is by the bondholders, which I

8    think essentially are, don't want to be compelled to provide

9    bond coverage to the new, to the new entity that buys the

10   assets and also, I think, to ensure that there are bonds in

11   place for the bonded-required jobs and, and again, I, I think

12   we can include language in there that is satisfactory to the

13   bondholders.

14        THE COURT:  Okay.

15        Does -- do any of the objectors wish to comment at

16   this point?

17        MR. SHADE:  No, Your Honor, other than -- this is Tom

18   Shade for Soy Capital Bank.

19        We are meeting with representatives of SARS to get an

20   update on their financing efforts to put this together.  And

21   our objection was, mostly, as to timing and whether any action

22   at this time might be premature until the financing and

23   stalking horse bidder are both known and, and capable of

24   proceeding.

25        THE COURT:  Okay.

1    Anybody else on the phone want to comment?

2    MR. WOLTERS:  Judge, John Wolters.

3    The only comment that I have is in regards to

4  Mr. Bourne's description of, of the plan of action.  I did not

5  hear him discuss prepetition claims, the Pension Funds as a

6  whole, and it would be appreciated if, if he could elaborate on

7  that.

8    THE COURT:  Mr. Bourne.

9    MR. BOURNE:  Well, Your, Your Honor, the, the

10  prepetition claims would be subject to the, the, Section 507,

11  be allegedly priority amounts.  It's contemplated that once the

12  debtor's assets are, are sold the funds would be set aside, the

13  case would be converted to Chapter 7, a trustee will be

14  appointed, and then the trustee will adjudicate any priority

15  claims, establish those, object to those, allow those as, as he

16  or she sees fit, and pay them according to the priority of the

17  Code.

18    THE COURT:  Okay.

19    Does that respond adequately, Mr. Wolters, to your

20  claim, to your question?

21    MR. WOLTERS:  Yes, it does.  Thank you.

22    THE COURT:  Okay.

23    Anybody else on the phone wish to comment?

24    MR. BROST:  Yes, Your Honor.  This is Gerry Brost for

25  the Internal Revenue Service.

1          And we have a concern that the, the sale itself may

2     generate a tax obligation and we would like to have the taxes

3     paid out of the proceeds of the sale.  I haven't put that in a

4     motion, but, if the Court wants, I will.

5          THE COURT:  Okay.  Well, I, I think that is going to

6     have to be, as with -- as the -- as with many other issues,

7     going to have to be the subject of some negotiation with

8     Mr. Bourne outside of court.  He's going to be putting together

9     a motion and from my experience, from the Court's experience,

10    the, the motion to actually set all the details of the

11    procedure are, those, those kind of motions are usually

12    negotiated in advance with the major players and the, and the

13    terms and, you know, it's not something where the debtor's just

14    going to throw something out and then, and then, you know,

15    without having talked to people and then have a big hearing

16    and, and have me make rulings, you know, one after the other on

17    disputed issues.

18          That's not how I usually see this work.  I don't think

19    that's how Mr. Bourne anticipates proceeding.

20          MR. BOURNE:  It's not, Your Honor.

21          Mr. Brost, if you want to call me to discuss your

22    concerns, I'll be glad to discuss them with you.

23          MR. BROST:  Okay, great.

24          THE COURT:  Anybody else on the phone wish to comment?

25          MR. MOSS:  Judge, Thom Moss for Busey Bank.

1          I didn't file an objection because I thought what they

2    filed at this point was just kinda what their intent is --

3          THE COURT:  Uh-huh.  (Indicating an affirmative

4    response)

5          MR. MOSS:  -- and no details.  I assume that when they

6    get further along we'll have a chance to object or respond to

7    whatever motion to sell they actually file.

8          THE COURT:  Yeah, absolutely.  This, this is just kind

9    of a status hearing, a preliminary hearing to see where things

10   are going and to, to allow people to raise preliminary issues.

11         Let me ask Mr. Ruppel whether the U. S. Trustee has

12   any input at this point.

13         MR. RUPPEL:  I -- we have no input at this time.

14         THE COURT:  Okay.

15         So it looks like we'll be expecting to, to receive a

16   motion that sets forth the, the sale procedures if not within

17   30 days, maybe shortly after the 30 days expire.  And we, we

18   can set a, a second hearing on this motion maybe about 30 days

19   out.

20         One of the things, since I made some notes on, of my

21   own on the, on the motion, let me just raise a couple of things

22   that I was concerned about.

23         The, the assets to be sold include vehicles and, and

24   Schedule D lists five vehicles that are to be sold.  Four of

25   those are liened to GMAC and, and one to Busey.  And it, it's

1    always a difficult issues, or can be a difficult issue when the

2    assets to be sold are not the collateral of a single lender.

3           So we have Soy as the primary lender, although they

4    may be taken out, but if we have a sale that includes assets

5    of, of other lenders and it's a bulk sale with no identified

6    allocation with regard to price as to certain assets, then we

7    get into difficult questions about how to allocate the proceeds

8    of sale toward the collateral of, of the various lenders.

9           So I would ask you to think about that and try to

10   figure out how you're going to address that in the, in the

11   motion.

12          MR. BOURNE:  Well, fortunately, I think that's

13   relatively easy, Your Honor.  There are only two -- I, I think

14   that Soy -- I believe Soy has one or two vehicles in its

15   security agreement, Busey has, I believe, one vehicle, and GMAC

16   has one vehicle.  There's one vehicle that's been surrendered

17   back to GMAC and one vehicle that's been retained.

18          It's my understanding -- I, I have the, copies of the

19   titles -- that the rest of the titles appear to me to be free

20   and clear of liens, but -- so that, that should make it

21   relatively easy to sort out.

22          THE COURT:  Okay.

23          The other thing I would, I would mention is more of a

24   general concern that, that is not necessarily specific to this

25   case, but it really is a concern in many, many cases like this,

1    that, that I am familiar with and that has to do with,

2    particularly in a situation like this where there is a, if not

3    an insider who is expected to be the stalking horse bidder, at

4    least a -- there's some relationship, apparently, between this

5    particular bidder and the debtor, or the debtor's principals

6    that, that predates the, the bankruptcy case.

7         In, in that kind of a situation, I'm always concerned

8    about whether or not the, the sale is going to be, what I would

9    call, a, a true auction that is conducted after adequate

10   marketing procedures that are, that are standard and customary

11   within the industry.  That's one option.

12        The other option is whether it's going to be what I

13   could call, primarily, a private sale with, with a, a bidder

14   that, that the debtor prefers, for, for whatever reason, and

15   where there's a known price and where that price may, may, in

16   fact, be a, a very good fair market offer.

17        There are two ways to handle this kind of a situation,

18   in my experience.  Where there is a known bidder and the bidder

19   is, is offering what, what it and the debtor consider to be a

20   fair market price, that, that is to say, sometimes a stalking

21   horse bidder will -- I hate to use the word "lowball" because

22   that's got, that's got baggage attached to it, but I'll use it,

23   anyway -- sometimes a stalking horse bidder will, will use a,

24   will start off with a low-ball bid with the idea that, that

25   it's going to participate in, in a true auction and, and there

1    will be active bidding and that, that low-ball bid is simply

2    exactly that, to be a starting point so that, so that other

3    bidders know where they have to start with.

4         In other situations -- maybe this is that situation --

5    the, the bid price, that is, the offer price -- and you

6    mentioned 2 million, $2 million.  You know, I have no idea at

7    this point whether that's in the ballpark for being a fair

8    market value for the assets or not -- but if that is a figure

9    that, that the bidder, SARS, and the debtor feel is, is

10   reflective of fair market value and the debtor wants that to be

11   the accepted bid the alternative would be to have the motion

12   propose a private sale without an auction, if, if that is what

13   the debtor wants, and then the issue would be, would become

14   evaluating the -- the -- whether or not that price is, in fact,

15   a good price and there, and there are procedures that could be

16   put in place to identify whether other bidders have an interest

17   that, in making a bid that would exceed that.

18        The, the benefit of, of doing that procedure, that

19   private sale procedure, is that the debtor avoids the expense

20   of hiring an investment banker who -- and an investment banker,

21   as everyone knows, is usually the entity that, that markets

22   the, the debtor's assets for sale; usually conducts the due

23   diligence process with a, a virtual document room; and then

24   usually even conducts the, the auction sale outside of the

25   courtroom.

1        And so -- so it's -- it's a -- it's an auction that's,

2   that's not conducted by the bankruptcy court.  It's conducted

3   by a third party, that being, usually, the, an investment bank

4   or some entity that, that fills that, that role.

5        If -- if it's -- and so a private sale can, can save

6   all those expenses where the debtor doesn't have to hire an

7   investment banker or some other marketing person and doesn't

8   have to, you know, go through the, the process of having a, an

9   auction conducted either in or out of court and doesn't have to

10  go through the, the, what could be the expensive agreement with

11  the, with, with the stalking horse bidder for, you know,

12  reimbursements of expenses, for example, with regard to the

13  stalking horse not being the successful bidder.

14       The alternative, of course, is the true auction.  My

15  concern with, with conducting a, a true auction is that I

16  really want to see good marketing that is done.  If the debtor

17  wants to have a true auction and doesn't hire an investment

18  banker, then the question becomes, well, well, how, how are the

19  assets being marketed?  Who is going to be in charge of

20  marketing?  Who's going to pay for that, for all the expenses?

21  Usually, it's not sufficient, in my view, to simply place ads

22  in The Wall Street Journal and the Chicago Tribune and the

23  Peoria Journal Star and other newspapers and say, "We're going

24  to have an auction for these assets.  Come and bid."  That, you

25  know, that, that usually isn't sufficient for this kind of a

1    scenario.

2          Usually, it, it does require a, some kind of a due

3    diligence, a relatively extensive due diligence opportunity

4    for, for bidders and there, and there usually has to be some

5    process to identify who might be likely bidders.  Usually, in

6    this kind of a case I would guess it's probably going to be

7    competitors of the debtor, that, that is to say, companies who

8    are already in this industry, in the construction industry in,

9    in, in the, the same field that, that T. A. Brinkoetter & Sons

10   occupies.  But usually, it's an investment bank or some other

11   marketing person that that identifies those kind of entities

12   that might be interested in bidding.

13         I suppose in this day and age you can't exclude the

14   possibility that hedge funds or private equity firms would also

15   be potentially interested in this.  I don't know how likely

16   that is.  I, I tend to think it's probably not as likely with

17   regard to this kind of a business versus other kinds of

18   businesses that aren't -- there, there's just such a

19   specialized niche here with regard to this kind of a business

20   and -- and -- and all the complexities that relate to the, the

21   union relationships that have been raised and everybody's aware

22   of in this particular case that, that I, I don't think it's

23   likely that this would be a situation where hedge funds or

24   private equity funds would, would be interested in, in, in

25   actively bidding unless they thought they could come in and,

1    and, you know, steal it for some kind of a, a low-ball price.

2           But, you know, it's probably going to be a situation

3    where, where competitors in the industry or, or, if not direct

4    competitors, others who are already in the industry in some

5    other way and who, who view this business as maybe being a

6    complimentary addition to, to their own business.

7           So I, I just throw that out as -- as -- so you can

8    think about that, Sumner, as, as to whether this really is

9    going down the true auction path, which would require that,

10   that marketing and due diligence element to it, or whether this

11   is really going to be more of a private sale, which can avoid a

12   lot of those costs and expenses, but, but there would still

13   have to be an opportunity for testing the, the private, the,

14   the validity of the private sale price as truly a fair market

15   bid.

16          So I throw that out for what it's worth.

17          MR. BOURNE:  Can I ask a question or two?

18          THE COURT:  Yes.

19          MR. BOURNE:  On the, on the private sale issue, if

20   that's the route the debtor chooses to go, what, in terms of

21   outside experts, what, what would the Court be looking for for

22   valuation?

23          THE COURT:  I, I think that it's, it's, it's an easier

24   scenario when there's a secured lender, such as Soy, who is in

25   place at the time of the sale.  The twist here is that you're

1    telling me Soy may get paid outside of, outside of the debtor's

2    assets and may be gone.  If Soy was in place, then what I, my

3    answer to that would be it's going to be up to Soy, primarily,

4    because it's, it's Soy's ox that would be getting gored with a

5    low-ball price.

6           So Soy would, would have the burden, essentially, of,

7    of taking whatever action it felt it could, it wanted to take

8    and, and one option, of course, is that if Soy felt that, that

9    this was not the best option for it, then it, it could oppose

10   the sale and move for relief from the stay and, and have, have

11   the assets liquidated outside of bankruptcy court.

12          But what you're telling me is that if Soy is out of

13   the picture, then it falls probably, as, as best I can tell at

14   this point, to the IRS, who, as I understand it, holds a fairly

15   large tax lien, which would be a secured claim, but, as I

16   understand it, the IRS' claim is less than a million dollars.

17          So if we have a $2 million price, then, then other

18   parties would then be coming into the picture to determine

19   whether or not they felt it would be a good offer and it may,

20   it may even boil down to what the U. S. Trustee thinks in terms

21   of protecting the unsecureds.  As I understand it, there's no

22   committee in place here, is that right, so it's really the, you

23   know, the burden is then on the U. S. Trustee and the unsecured

24   creditors themselves to independently evaluate that issue.

25          So, so it wouldn't be something where, where I would

1   be looking for any particular justification .  It -- I would be

2   responding to what the parties raised and what they wanted.

3            MR. BOURNE:  Thank you, Your Honor.

4            On the -- and on the, the true auction option that

5   Your Honor discussed, again, what the debtor is trying to do

6   here, for good or for bad again, is trying to avoid the, the

7   cost of an outside marketing firm just because the, the debtor

8   has struggled to pay postpetition obligations, IRS, and that,

9   and I don't think the creditors or the debtor really want a lot

10  of the money being diverted towards, in my view and my

11  experience, an expensive marketing company that really is

12  unlikely to achieve any, any large results.

13           So I guess the question on the true auction, what

14  would the Court be looking for for marketing efforts there?

15  Could that be done internally by the debtor or, again, would

16  that require an outside marketing firm?

17           THE COURT:  Well, I, you know, the, the, the standard,

18  the customary thing that we see is the use of outside marketing

19  firms like an investment bank or somebody who fills that role.

20  It's -- again, it's something that I think is, is the subject

21  of negotiation with, with the major creditors.  And, and if the

22  -- I will say, as a general rule, if the debtor and the

23  creditors, including the U. S. Trustee, the major creditors and

24  the U. S. Trustee agree on a procedure it would be very

25  unlikely that I would not go along with it.

1            I mean, it's really something that, that the creditors

2    have to -- in other words, the burden is on the debtor to

3    persuade the creditors that what it is proposing is the best

4    possible avenue for obtaining the best possible result and if

5    the creditors feel that, that some other avenue is, is better

6    for them, then that needs to be the subject of negotiation and,

7    you know, but again, ultimately, if Soy is out of the picture,

8    I think that really changes the, the, the negotiation terrain,

9    if you will, because it really injects the unsecured creditors

10   into the picture where, whereas right now it appears that Soy

11   is undersecured, or at least that's been the representation all

12   along and, and that there, there wouldn't be any, you know,

13   anything.

14           And, of course, that, you know, the other issue is --

15   and this is probably a smaller issue here -- is, is whether

16   there would be a carveout for unsecureds from the assets, but

17   if Soy is out of the picture I think that really becomes,

18   probably, a non-issue and I, you know, maybe Mr. Ruppel would

19   feel differently, but I think if Soy's out of the picture the

20   carve-out issue for unsecureds is really, probably, a non-

21   issue.

22           So, you know, that, that's another good thing, I

23   guess, another thing that maybe makes it easier for the debtor

24   to, to get something accomplished, but I really think it, it's,

25   it has to be, or should be the, a negotiated agreement or at

1   least, or at least, if not a full agreement, at least the

2   fundamentals of an agreement and we can have a hearing down the

3   road that, that the parties can express concerns and, and try

4   to get some guidance from me, if, if, if that's what you want,

5   in terms of some details.

6          But, but I really think that, that the debtor needs to

7   be persuading the, the major parties that, that, you know, if,

8   if it wants to sell it to SARS and it's got what it thinks is a

9   good fair market value bid, then try to persuade these parties

10  to go along with it and that would be, I think, the, where

11  you're going with it.

12         MR. BOURNE:  Okay.

13         THE COURT:  So.  Okay?

14         Anything else from anybody?

15    (No response)

16         THE COURT:  Let's pick a date, then, to just have a

17  continued hearing on this motion.  We'll do it the same way

18  with a call-in so people from out of town can, don't have to

19  travel here and then we'll see where we're at.

20         Maybe -- are we looking, maybe, at the first part of

21  November?

22         MR. BOURNE:  I think that'd be prudent, yeah.  That

23  would be -- that would be --

24         THE COURT:  Okay.

25         THE COURT:  I can set it, maybe the --

1          You're not responsible or anything for the Chapter 7

2    trustee seminars, are you?

3          MR. BOURNE:  No.

4          THE COURTROOM DEPUTY:  -- Tuesday, November 3rd.  It

5    looks like that --

6          THE COURT:  Is that too soon?

7          THE COURTROOM DEPUTY:  Or the 10th, Tuesday, the 10th.

8          MR. RUPPEL:  The -- our office is going to --

9          THE COURT:  Oh.

10          THE COURTROOM DEPUTY:  Oh.  That's true.

11          MR. RUPPEL:  -- be fairly short.

12          THE COURT:  That's right.  Yeah.

13          THE COURTROOM DEPUTY:  Okay.

14          THE COURT:  I should have known that.

15          MR. RUPPEL:  Either Sabrina and/or I, both.

16          THE COURT:  Okay.

17          THE COURTROOM DEPUTY:  Okay.  Tuesday, the 10th, then?

18          THE COURT:  That's the 3rd?

19          MR. RUPPEL:  2nd and 3rd.

20          THE COURTROOM DEPUTY:  2nd and 3rd.

21          THE COURT:  Okay.  All right.

22          THE COURTROOM DEPUTY:  And then you're gone to

23    Springfield on the 4th; Rock Island on the 5th.  So --

24          THE COURT:  So the following Tuesday is the 10th?

25          THE COURTROOM DEPUTY:  The following Tuesday is the

 1  | 10th.

 2  |          THE COURT:  That's probably -- that's, you know,

 3  | that's probably --

 4  |          MR. BOURNE:  That, that'd be fine.

 5  |          THE COURT:  -- okay, yeah.

 6  |          MR. BOURNE:  Sure.

 7  |          THE COURT:  All right.

 8  |          THE COURTROOM DEPUTY:  Okay.

 9  |          THE COURT:  So Tuesday, November 10th, at 10:00 a.m.?

10  |          MR. BOURNE:  That's fine.

11  |          MR. RUPPEL:  That's not a holiday?  Maybe it's the

12  | 11th.

13  |          THE COURTROOM DEPUTY:  No, the next day --

14  |          MR. RUPPEL:  The 11th.

15  |          THE COURTROOM DEPUTY:  -- is the holiday.

16  |          MR. RUPPEL:  Okay.

17  |          THE COURTROOM DEPUTY:  Wednesday.

18  |          THE COURT:  Oh, Wednesday is a federal holiday?

19  |          THE COURTROOM DEPUTY:  It's --

20  |          MR. RUPPEL:  Yes.

21  |          THE COURTROOM DEPUTY:  -- Veterans Day.

22  |          THE COURT:  Oh.

23  |          MR. RUPPEL:  Veterans Day.

24  |          THE COURT:  Okay.  Okay.  So --

25  |          MR. RUPPEL:  11/11, I shoulda -- yeah.

1          THE COURT:  Tuesday, the 10th at 10:00 a.m.

2          Thank you.

3          MR. SHADE:  Thanks, Judge.

4          THE COURT:  Goodbye.

5          MR. MOSS:  Thank you.  Bye.

6          MR. RUPPEL:  Thank you, Your Honor.

7      (Proceedings concluded at 10:34 a.m.)

8

9

10

11

12

13

14                        CERTIFICATE

15          I, court approved transcriber, certify that the

16  foregoing is a correct transcript from the official electronic

17  sound recording of the proceedings in the above-entitled

18  matter.

19  /s/ Janice Russell                    October 5, 2009

20  Janice Russell, Transcriber                   Date

21

22

23

24

25